**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **RANDALL EWING and** | ) | |
| **YASMANY GOMEZ,** | ) | |
| | ) | **CASE NO. 16-CV-9930** |
| **Plaintiffs/Counter-Defendants,** | ) | |
| | ) | |
| **v.** | ) | **District Judge Sharon Johnson Coleman** |
| | ) | |
| **1645 WEST FARRAGUT LLC,** | ) | |
| | ) | |
| **Defendant/Counter-Plaintiff.** | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT ON THEIR CLAIMS AND DEFENDANT'S
COUNTERCLAIM**

# TABLE OF CONTENTS

Introduction…………………………………………………………………………………1

Argument…………………………………………………………………………………2

    **I.   Plaintiffs Are Entitled to Summary Judgment on Their Breach of Contract Claim……………………………………………………………………...2**

        A.  Defendant breached the contract in four different ways………………………..2

            1.  Defendant falsely represented in the contract that it had no notice of building code violations and work performed without permits………………2

            2.  Defendant invoked an improper remedy when it imposed damages on Plaintiffs for allegedly not making selections on time………………………5

            3.  Defendant terminated the contract under the mortgage contingency even though Defendant's stop work order caused a "delay in the loan approval process"……………………………………………………………………6

            4.  Defendant breached the contract by refusing to enclose the second-floor balcony…………………………………………………………………………7

        B.  Plaintiffs substantially performed the contract………………………………...10

            1.  Plaintiffs' performance was excused by Defendant's material breaches……………………………...………………………………………10

            2.  Plaintiffs made reasonable and timely efforts to obtain a mortgage commitment, but it was impossible to do so because of the stop work order……………………………………………………………….........12

    **II.  Plaintiffs Are Entitled to Summary Judgment on Their Fraud and Illinois Consumer Fraud Act Claims…………………………………………………12**

    **III.  Plaintiffs Were Damaged.................................................................13**

    **IV.  Plaintiffs are Entitled to Summary Judgment on Defendant's Counterclaim…………………………………………………………………16**

        A.  Plaintiffs did not cause any damages…………………………………………16

        B.  Plaintiffs have the option of rescinding the contract because of fraudulent inducement and mutual mistake………………………………………………17

Conclusion…………………………………………………………………………18

`

## Introduction

This action involves Mr. Ewing's and Mr. Gomez's attempt to purchase a home that was owned by Defendant, then gutted all the way to the exterior brick, under construction, and not to be complete as a finished, livable home for another 6 months. The attempted purchase was documented in two contracts: a 6.1 Contract on April 17, 2016, and a Modification of that 6.1 Contract on May 2, 2016. The estimated date of completion was October 3, 2016. The contract contained a mortgage contingency providing that Plaintiffs were to notify Defendant by August 15, 2016, if they were unable to obtain a mortgage commitment by that day, and, if so, Defendant had until October 15, 2016, to procure one. If neither party could do so, the contract was to be declared void.

When neither party could obtain a "mortgage commitment" by the dates set forth in the contract because Defendant falsely represented in the contract and elsewhere that it had building permits for the work already performed—and the City of Chicago stopped all work on the property for five months—Plaintiffs requested their earnest money back. Instead of giving them their money back, however, Defendant declared Plaintiffs in breach, claimed Plaintiffs' $117,500 earnest money, and sold the house to someone else. It did so even though from the date Plaintiffs met Defendant through the termination of the contract, it could not and did not perform an iota of work.

Plaintiffs are entitled to partial summary judgment on their claims for breach of contract, fraud, and under the Illinois Consumer Fraud Act for several alternative, undisputed reasons:

1. Defendant's agent, Mr. Carrier, told Plaintiffs prior to executing the contract that preexisting work had building permits and complied with building codes, Defendant represented the same in the contract, and Defendant promised to promptly notify Plaintiffs if it learned to the contrary. Defendant, however, already knew there was work performed without permits, which led to a stop work order on the property for 5 months, and Defendant never notified Plaintiffs of the stop work order.

2. Defendant imposed "delay damages" on Plaintiffs for allegedly not making selections on time even though the contract sets forth Defendant's remedy for Plaintiffs' alleged untimely selections and does not include imposing monetary damages to be taken from the earnest

money. Defendant did so even though at the time—and unbeknownst to Plaintiffs—it could not have performed any work on the property regardless of what Plaintiffs selected.

3. The contract provides that a party causing a "delay in the loan approval process" shall not have the right to terminate the contract because of the mortgage contingency. Defendant did so, however, even though it is undisputed and confirmed by Defendant's own expert witness that a mortgage commitment required an appraisal of the property in a livable state and that a stop work order on a gutted house (i.e., empty except for exterior brick and sub-floors) would prevent an appraisal and qualify as a delay in the loan approval process.

4. Defendant told Plaintiffs prior to entering into the contract that it would enclose the second-floor balcony if Plaintiffs wanted (as it was on the recently rehabilitated and finished property next door owned by Mr. Carrier's other LLC), Plaintiffs demanded in the contract in multiple places that 1645 West Farragut be built with the same "finishes and amenities" as that property next door, the MLS advertisement stated the property would be constructed with an enclosed balcony, and **immediately after the contract was executed**, Defendant asked Plaintiffs if they still planned **"to enclose the 2nd Floor patio**." Defendant was later able to enclose the second-floor balcony but refused.

As a result of these material contract breaches and fraud, Plaintiffs were deprived of their ability to buy a home in Chicago and have lost the use of their $117,500 in earnest money even though (1) no changes were made to the property on their account before it was sold to someone else and (2) the entire time Plaintiffs were involved, the City barred Defendant from doing any work.

Argument

## I. Plaintiffs Are Entitled to Summary Judgment on Their Breach of Contract Claims

### A. Defendant breached the contract in four different ways[1]

#### 1. Defendant falsely represented in the contract that it had no notice of building code violations and work performed without permits

At the time Plaintiffs first viewed the property at 1645 West Farragut (following a tour of and discussions about the finished property next door at 1651 West Farragut), the house was completely gutted all the way down to the brick masonry with wooden sub-floors (i.e., no finishes or interior

---

[1] Under Illinois law, the elements of a breach of contract claim are: "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by defendant; and (4) resultant damages." *WW Vincent v. First Colony Life Ins.*, 814 N.E.2d 960, 967, 351 Ill.App.3d 752 (Ill. App. Ct. 2004).

walls, electrical wiring, heating or cooling systems, finished plumbing, or duct work), and the basement had already been excavated and underpinned, but with no concrete slab. Pl.'s SUF ¶ 8. Defendant assured Plaintiffs before entering into the contract whether the work already done had been permitted and complied with all applicable building codes. Ex. 1, Decl. of Tim Zielonka at ¶ 33.[2]

Reinforcing the importance Plaintiffs placed on this pre-contract statement, the 6.1 Contract contained a representation that "Seller has no knowledge of," nor has it received any notice from a governmental entity regarding, (1) "zoning, building, fire or health code violation[s] that have not been corrected" or (2) "any improvements to the Property for which the required initial and final permits were not obtained." Ex. 2, 6.1 Contract at ¶ 23. Defendant also promised that if it learned "prior to closing" of "matters that require modification of the representations previously made herein, [it] shall promptly notify [Plaintiffs]." *Id.* When Defendant tried to remove this language in the Modification, Plaintiffs demanded that this provision be reinserted, and Defendant agreed. Pl.'s SUF ¶¶ 23, 28; Ex. 3, Modification at ¶ 6.[3] This language is straightforward and unambiguous.

Unbeknownst to Plaintiffs, however, Defendant knew as early as February and March 2016 that the basement had been excavated and underpinned by U.S. Waterproofing without proper permits. Pl.'s SUF ¶¶ 10, 11, 33-37; Ex. 4, Mar. 7, 2016 email chain involving U.S. Waterproofing and Erik Carrier, at p. 1 ("Apparently they only pulled a permit for the drain tile and sump pump and basin portion. They assumed your permit would cover the underpinning."); *id.* ("I am not sure how we should proceed from here. Unfortunately, we already submitted to the city and they are asking for a permit number for the work you did in order for our permits to proceed."). This fact is undisputed based on Mr. Carrier's own emails and the declaration submitted by U.S. Waterproofing. Pl.'s SUF ¶¶

---

[2] Citations to "Ex. ___" refer to the exhibits submitted as part of the Declaration of Steven Mora in support of Plaintiffs' Motion and Statement of Undisputed Facts.

[3] While negotiating the contracts, Plaintiffs discovered a contractor had performed work on their property in Florida without pulling required permits, which cost thousands of dollars to fix. Pl.'s SUF ¶ 67.

33-37; Ex. 5, U.S. Waterproofing Decl. at ¶¶ 3-5 ("U.S. Waterproofing made Erik Carrier aware before April 17, 2016 that a necessary permit had not been obtained prior to the underpinning work."); Ex. 6, Feb. 22, 2016 email between Mr. Carrier and U.S. Waterproofing at p. 2 ("we're dead in the water the city will not let us proceed any further").

This breach was not trivial, because by June 6, 2016, the City of Chicago placed a "stop work order" on 1645 West Farragut because of the lack of building permits, which required Defendant to "STOP ALL WORK ON PREMISES." Pl.'s SUF ¶ 36.[4] When a permit for this pre-contract work still had not been obtained by July 6, 2016, Mr. Carrier recognized that Defendant's "project completion date is now pushed back to the winter," and he later blamed U.S. Waterproofing for causing him to be unable to perform any work until it was resolved and for liability exposure on 1651 Farragut, Mr. Carrier's property next door where the same thing happened. Pl.'s SUF ¶ 37.[5]

Mr. Carrier never notified Plaintiffs of these issues, much less "promptly." Pl.'s SUF ¶ 38. Defendant did not obtain a permit for the pre-contract underpinning work until August 26, 2016, and the stop work order was not removed until November 9, 2016 (at which point the contract was already terminated and Defendant had claimed Plaintiffs' earnest money). Pl.'s SUF ¶ 35; Ex. 9, Def.'s Oct. 21, 2016 Letter to Plaintiffs. Neither the imposition of the stop work order, nor the length of time it was in effect, was caused by Plaintiffs. Pl.'s SUF ¶¶ 37, 39, Ex. 5, U.S. Waterproofing Decl. at ¶ 8 ("No delays in obtaining permits … occurred as a result of potential buyers of the property.").

Defendant was in breach of the parties' contract on the day it was executed. Defendant's representations and obligations have only one plain meaning, and there is no reasonable dispute that

---

[4] A stop work order by the City of Chicago must be based on a violation of building codes, e.g., performing underpinning work without an approved permit. Ex. 7, Municipal Code of Chicago 13-32-130 ("Operations without permit – Stop Work Order") and 13-32-120 ("Construction contrary to permit – Stop Work Order").

[5] Mr. Carrier made similar omissions about the permitted status of preexisting work to a potential buyer for 1651 West Farragut, Michael Furibondo. Ex. 8, Furibondo Decl. at ¶¶ 2-4.

on the day it executed the contract, Defendant had knowledge of building code violations and work performed without permits. There is no genuine factual dispute that Defendant breached the contract on day one and induced Plaintiffs to enter into the contract through fraudulent misrepresentations.

### 2. Defendant invoked an improper remedy when it imposed damages on Plaintiffs for allegedly not making selections on time

On June 20, 2016, Defendant wrote to Plaintiffs and told them that it was assessing more than three thousand dollars in damages to be taken from the earnest money because of Plaintiffs' alleged delays in making selections. Pl.'s SUF ¶ 42. By June 28, 2016, Defendant increased those damages to more than seven thousand dollars, and again stated that they would be taken from Plaintiffs' earnest money, rebuffing Mr. Ewing's repeated pleas for it to withdraw its claim to damages. Pl.'s SUF ¶ 45.[6]

Section 10 of the Modification expressly set forth what would happen if Plaintiffs did not make selections on time, however, and it says nothing about imposing monetary damages. In fact, it is impossible for Plaintiffs to breach the contract by not making selections on time because the Modification provides that "In the event of failure of Purchaser to make selections within fifteen (15) days of being so requested to do so by Seller, **Purchaser hereby authorizes Seller to complete the Property with such selections as Seller deems suitable**." Ex. 3, Modification at ¶ 10. There is no language in Section 10, or any other Section, that permitted Defendant to claim Plaintiffs' earnest money because of selection delays rather than using its express authorization to complete the property.

If not expressly prohibited, Defendant's exercise of its discretion is a breach of the implied covenant of good faith and fair dealing. *See Mcleary v. Wells Fargo Sec., LLC*, 29 N.E.3d 1087, 1093, 390

---

[6] While Plaintiffs dispute that they did not make timely selections, Defendant's claim to damages was improper regardless. On June 3, 2016, Plaintiffs sent plans to Defendant that included enclosing the second-floor balcony and moving the front entrance to the side, and it was understood such changes would need to be approved by the City of Chicago. Pl.'s SUF ¶ 41. Defendant claimed damages, however, before even informing Plaintiffs whether the City would allow their changes (which the City did). Pl.'s SUF ¶ 43. Mr. Ewing expressed his concern about the claim to damages and repeatedly requested that they be withdrawn by Mr. Carrier, but Mr. Carrier refused. Ex. 11, Ewing Decl. at ¶ 45.

Ill. Dec. 817 (Ill. Ct. App. 2015) (every contract "contains an implied duty of good faith and fair dealing" that requires any discretion to "be exercised reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectation of the parties.").

Plaintiffs did not reasonably expect to have more than seven thousand dollars of their earnest money claimed for alleged delays in approving floor plans during a time when (1) they gave Defendant the right to complete the property however it wanted, and (2) Defendant was prohibited by the City of Chicago from implementing Plaintiffs' (or its own) selections regardless. Defendant was not entitled to scare Plaintiffs with damages and fabricate time pressure just because its own stop work order prevented it from exercising the contractually specified remedy.

### 3. Defendant terminated the contract under the mortgage contingency even though Defendant's stop work order caused a "delay in the loan approval process"

The Modification required Plaintiffs to notify Defendant by August 15, 2016, if they were unable to obtain a mortgage commitment by that day. Ex. 3, at ¶ 2. Defendant's mortgage expert testified that "mortgage commitment" in the mortgage business is a commitment to lend after it has been submitted and approved by the lender's underwriting department. Ex. 10, Hoppe Dep. at 76:2-77:6, 111:11-112:12. He also testified that before a loan application can be submitted to underwriting and a mortgage commitment obtained, the property needs to be appraised when in a livable state. *Id.* at 56:10-57:10, 60:14-61:3, 85:10-87:10. Mr. Ewing's mortgage brokers told him the same thing. Ex. 11, Ewing Decl. ¶¶ 51, 54, 56, 58. It is undisputed that 1651 West Farragut was still gutted and not in a livable state on both August 15 and October 15, 2016. Pl.'s SUF ¶ 35, 36-37, 39.

When Plaintiffs informed Defendant on August 15, 2016 that they were not yet able to obtain a mortgage commitment, Defendant exercised its right to obtain a mortgage commitment for Plaintiffs by October 15, 2016. Pl.'s SUF ¶ 52. When there was no mortgage commitment on October 21, 2016, Defendant wrote to Plaintiffs declaring them in breach of the mortgage contingency, the agreement

as null and void, and that it would be taking the earnest money as liquidated damages. Ex. 9, Oct. 21, 2016 Letter from James Sethna to Tim Kelly.

The contract, however, provides that a party causing a "delay in the loan approval process" shall not have the right to terminate under the mortgage contingency. Ex. 3, Modification, at ¶ 2. There is no dispute that a 5-month stop work order still in effect on October 15, 2016, on a home that is still completely gutted (and that was never worked on during the entirety of the contract) prevented the property from being appraised in a livable state by that day, regardless of anything done by Plaintiffs. Defendant's own mortgage expert agreed that it delayed the loan approval process. Ex. 10, Hoppe Dep. at 61:9-12; 85:20-87:10. Defendant breached when it terminated the contract despite causing a substantial delay in the loan approval process.

### 4. Defendant breached the contract by refusing to enclose the second-floor balcony.

When Plaintiffs toured the finished, next-door property at 1651 West Farragut, it had an enclosed balcony open to the master bedroom that Mr. Carrier's other LLC described in its advertisement summary as a "private, light-filled reading room." Pl.'s SUF ¶ 15. In the 6.1 Contract, Defendant agreed that 1645 West Farragut would be "finished and construction budgets set according to the level of finishes and amenities at 1651 W. Farragut," and that "It is understood Plaintiffs can make changes to construction plans." Ex. 2, 6.1 Contract at ¶ 2. In the Modification, the parties agreed that Plaintiffs could request change orders and that consent to those change orders shall not be "unreasonably withheld." Ex. 3, Modification, at ¶ 10. The Modification further provides that "where the amenities and/or level of finishes are not set forth herein, the parties shall look to the property at 1651 West Farragut Avenue as a model for such amenities and finishes." *Id.* at ¶ 21. This contract language unambiguously required Defendant to provide an enclosed balcony.

A contract provision "is not rendered ambiguous simply because the parties disagree as to their meaning." *Gaudina v. State Farm Mut. Auto Ins. Co.*, 8 N.E.3d 588, 593-94, 380 Ill. Dec. 418 (Ill.

Ct. App. 2014). When a term, e.g. "finishes and amenities," is not specifically defined, courts "afford that term its plain, ordinary and popular meaning, i.e., we look to its dictionary definition." *Id.* Black's Law Dictionary defines amenity as anything "tangible or intangible that increases the enjoyment of real property." Black's Law Dictionary (10th ed. 2014). Oxford Dictionary defines an amenity as "a desirable or useful feature or facility of a building or place."[7] An indoor balcony off the master bedroom (or "private, light-filled reading room") is a desirable or useful feature and one that increases the enjoyment of the property relative to a completely unenclosed, exposed-to-the-elements balcony, which Mr. Carrier reinforced by highlighting that feature in his 1-paragraph advertisement summary for the property next door.

As Plaintiffs understood the contract provisions when they were buying a building consisting solely of an exterior shell to be finished in 6 months after having toured Mr. Carrier's finished rehab next door—with the exact same lot size, building foundation size, and same type of masonry—they had the right to demand any feature on the finished property at 1651 West Farragut be included on the gutted home at 1645 West Farragut so long as it was possible to do so. Ex. 11, Ewing Decl. at ¶ 17-19. This was the only way to structure the deal that made economic sense to them by guaranteeing they would be getting as good a house as the one next door (for which they were paying the same net asking price), but with the ability for additional customization so long as they paid for anything beyond what was already on the property next door. *See Dispatch Automation, Inc. v. Richards*, 280 F.3d 1116, 1119 (7th Cir. 2002) ("Where a contractual interpretation makes no economic sense, that's an admissible and, in the limit, compelling reason for rejecting it."). Plaintiffs did not expect to pay the same price for a smaller home without a private, light-filled reading room.

Defendant claims, however, that the Modification's language about constructing the home in "substantial compliance with the plans on file" means the balcony was not to be enclosed because the

---

[7] *See* https://en.oxforddictionaries.com/definition/amenity (last visited Dec. 20, 2018).

plans on file that day allegedly did not include enclosing the balcony. Defendant's interpretation—based on reading this clause solely in the past tense and with no room for future changes—is facially unreasonable. By ignoring the ability for the plans to change in between contract execution and closing, Defendant's interpretation renders the other provisions about the property next door and change orders completely superfluous. Defendant's interpretation should be rejected as facially unreasonable and an insufficient basis to create an ambiguity because of the "presumption against superfluity." *See Avilia v. CitiMortgage, Inc.*, 801 F.3d 777, 787 (7th Cir. 2015).

In contrast, Plaintiff's interpretation harmonizes both provisions in that Defendant was required to build the property in substantial compliance with the plans on file *at the time the property was completed*, but nothing prevented the parties from changing the plans on file during the time period for making selections and change orders. *See Cent. Ill. Light Co. v. Home Ins. Co.*, 213 Ill.2d 141, 821 N.E.2d 206, 213 (2004) ("[A] contract[] is to be construed as a whole, giving effect to every provision, if possible, because it must be assumed that every provision was intended to serve a purpose.").

Even if the contract is ambiguous with respect to enclosing the second-floor balcony, summary judgment is still proper because the evidence in favor of Plaintiffs is overwhelming and the parties do not dispute the historical facts, only their legal significance.[8] *First*, there is uncontradicted evidence from both Plaintiffs and their third-party realtor that Plaintiffs and Defendant discussed enclosing the balcony on 1645 West Farragut before entering into the contract. Pl.'s SUF ¶__. *Second*—and as confirmation of the first point—Defendant asked Plaintiffs **at the exact moment the contract was executed** whether they still planned on "**enclosing the 2nd Floor patio?**" Ex. 12, May 2, 2016 email from Mr. Carrier to Plaintiffs, at p. 5. *Third*, the parties expressly discussed that they would be

---

[8] Summary judgment is appropriate when interpreting ambiguous contract terms if (1) the historical facts supplying the extrinsic evidence are undisputed, or (2) the undisputed extrinsic evidence is one-sided enough that no reasonable jury could find for the non-movant. *Continental Cas. Co. v. Northwestern Nat. Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2002); *Murphy v. Keystone Steel & Wire Co.*, 61 F.3d 560, 565 (7th Cir. 1995)

sending revised plans to the city after the contract was executed, which contradicts Defendant's claim that the property had to be built based on the plans on file the day the Modification was executed with no future changes. Pl.'s SUF ¶ 32. Ex. 13, April 18, 2016 email from Mr. Carrier to Pl.'s realtor ("There have not been any updates [to the prior plans], but we will have a few requested updates from the city shortly … it would be best to include any changes by your buyers with the revised set to the city … we are still in a great position to make changes at this point."). *Fourth*, the MLS Listing advertisement represented the home would come with an "enclosed" balcony on the "second floor." Pl.'s SUF ¶ 16.

It is a "firmly established principle of contract interpretation that courts should give great weight to the parties' interpretation of the contract" through this type of post-contractual course of performance evidence. *Barney v. Unity Paving, Inc.*, 639 N.E.2d 592, 596-97 (Ill. Ct. App. 1994). While Defendant may have later changed its mind, it cannot ignore that when executing the contract, it advertised the home would come with an enclosed balcony, recognized that Plaintiffs still had the option of enclosing the second-floor balcony, and acknowledged that the plans then on file would not be the final plans by which "substantial compliance" would be measured.

It is undisputed and admitted that Defendant refused to enclose the second-floor balcony, despite the City of Chicago allowing it. Pl.'s SUF ¶¶ 43-44, 46. Defendant refused even if Plaintiffs paid for it, *id.*, which was also a breach of the provision not to unreasonably refuse change orders.

## B. Plaintiffs Substantially Performed the Contract

Defendant alleges that Plaintiffs failed to perform in securing a mortgage commitment. Defendant's argument fails, however, because (1) Plaintiffs' performance was excused by Defendant's material breaches; and (2) Plaintiffs made reasonable efforts to obtain a mortgage commitment.

### 1. Plaintiffs performance was excused

It is axiomatic that a contracting party's material breach excuses non-performance by the other party. *Borys v. Rudd*, 566 N.E.2d 310, 315, 207 Ill.App.3d 610 (Ill. Ct. App. 1990). In this case,

Defendant was in breach of the contract the minute it was executed because of its knowledge of work performed without permits despite representations in the contract to the contrary, and it further materially breached by imposing delays damages and refusing to enclose the balcony.[9]

The materiality of these breaches is evidenced by the uncontradicted testimony of Mr. Ewing that Plaintiffs would not have entered into the contract had they known of the work performed without permits and that Defendant would refuse to enclose the balcony. Ex. 11, Ewing Decl. at ¶ 32. In fact, Plaintiffs specifically inserted express representations about the preexisting work's permitted status and the language about the amenities next door into the Modification after Defendant tried to remove them from the 6.1 Contract. Pl.'s SUF ¶¶ 23, 28. Additionally, during the time they were negotiating the contract Plaintiffs were particularly keen to these issues, having just discovered that a contractor performed work on their property in Florida without permits that required thousands of dollars and months to fix. Ex. 11, Ewing Decl. at 33.

The permit misrepresentations did not conceal a slight delay—they prevented Defendant from even *beginning to perform* the estimated 5-month construction process until November 2016, defeating the objective to complete the property in six months by at least 100%. Plaintiffs' non-performance also does not result in an unreasonable or unfair advantage because Defendant was in the same position it was in the day they first contracted—with a gutted home and unable to do any work because the City of Chicago placed a stop work order on it. The only party with an unreasonable advantage in this entire affair is Defendant, who kept the house while also trying to keep Plaintiffs money, all while hiding the fact that it could have never done a bit of work regardless.

---

[9] The factors influencing the materiality analysis include "whether the breach worked to defeat the bargained-for objective of the parties or caused disproportionate prejudice to the non-breaching party, whether custom and usage considers such a breach to be material, and whether the allowance of reciprocal non-performance by the non-breaching party will result in his accrual of an unreasonable or unfair advantage." *William Blair & Co. v. Fi Liquid.*, 803 N.E.2d 760, 779, 358 Ill.App.3d 324 (Ill. Ct. App. 2005).

### 2. Plaintiffs made reasonable and timely efforts to obtain a mortgage commitment by the specified dates, but it was impossible to do so because of the stop work order

Defendant's only allegations that Plaintiffs breached the contract are that they violated the mortgage contingency. Because the house was still in a gutted state, however, and subject to a stop work order on August 15, 2016—and it could not be completed, much less appraised in a livable state, for another 6 months thereafter—it was impossible for Plaintiffs to obtain a mortgage commitment by that day. As a result, their efforts up to that point in time were reasonable and timely.[10] Defendant also never inquired about Plaintiffs' mortgage efforts until August 15, 2016, Pl.'s SUF ¶ 75, thus waiving any claims of breach based on efforts to secure a mortgage commitment before then. *Tantillo v. Janus*, 87 Ill.App.3d 231, 237 408 N.E.2d 1000 (1980).

Defendant also bases its argument of non-performance on the fact that Stearns Lending proposed an application solely in Mr. Ewing's name, but with both Mr. Gomez and Mr. Ewing on the title, and that Plaintiffs did not proceed with that application. But, even if Mr. Ewing had proceeded with that application alone, it was still impossible for Defendant to obtain a mortgage commitment by October 15 because the house was still gutted, subject to a stop work order, and incapable of being appraised by that day regardless of anything done by Plaintiffs. The very same lender who offered that application serves as Defendant's mortgage expert, and he acknowledged that it would have been impossible for him to obtain a mortgage commitment by October 15, 2016, if the house was still subject to a stop work order, thus making anything Plaintiffs did irrelevant. Pl.'s SUF ¶ 71.

### II. Plaintiffs are entitled to summary judgment on their fraud and Illinois Consumer Fraud Act claims

Defendant's pre-contract statements, made through its agent Erik Carrier, entitle Plaintiffs to summary judgment for their fraud and Illinois Consumer Fraud Act claims. Defendant told Plaintiffs'

---

[10] Plaintiffs also spent the time until July 2016 working with Fifth Third Bank, Chase Bank, and Associated Bank to liquidate down payment funds and qualify income. Pl.'s SUF ¶¶ 63-71..

real estate agent that the work already performed had building permits. Plaintiffs testified that, had they known the truth that construction could not even begin until after they thought they would be living in the house, they would not have entered into the contract.[11] Defendant has no contradictory evidence, making these facts undisputed. Considering Mr. Carrier was emailing about the lack of permits at the exact same time as making these representations (contractual and oral), there is no reasonable dispute that Defendant knew them to be false. That Mr. Carrier reiterated these promises in both contracts shows that he intended Plaintiffs to rely on them.[12]

Defendant also told both Plaintiffs and their real estate agent that it would enclose the second-floor balcony if the city allowed it, and the MLS advertisement stated the property would come with an enclosed balcony. Defendant now claims, however, that it never intended to enclose the balcony and admits that it refused to do so despite the city allowing it, and despite it asking the day the Modification was executed whether Plaintiffs still wanted to enclose the balcony. These statements are actionable as fraud and under the Illinois Consumer Fraud Act.[13]

## III. Plaintiffs Were Damaged

At a minimum, Plaintiffs have been damaged and continue to be damaged in the amount of $117,500 because their earnest money has been withheld from them even though Defendant has long

---

[11] A claim of fraud requires (1) a false statement of material fact; (2) the party making the statement knew or believed it to be untrue; (3) the party to whom the statement was made a right to rely on the statement; (4) the party to whom the statement was made did rely on the statement; (5) the statement was made for the purpose of inducing the other party to act; and (6) the reliance by the person to whom the statement was made led to that person's injury." *Id.*

[12] A claim under the Illinois Consumer Fraud Act is easier to satisfy than fraud and requires (1) a deceptive act or practice, (2) intent on the defendant's part that plaintiff rely on the deception, and (3) that the deception occurred in the course of conduct involving trade or commerce." *Martin*, 643 N.E.2d at 754. The business of selling residential real estate involves trade or commerce. *See, e.g., Grimes v. Adlesperger*, 67 Ill. App. 3d 582, 585-86, 384 N.E.2d 537 (4th Dist. 1978)

[13] *See, e.g., Grimes*, 67 Ill. App. 3d at 585-86 (finding a violation of the Illinois Consumer Fraud Act where the MLS incorrectly stated the gross receipts of the property); *Zimmerman v. Northfield Real Estate, Inc.*, 156 Ill. App. 3d 154, 163-168,510 N.E.2d 409 (1st Dist. 1987) (upholding claims based on fraud, negligent misrepresentation, and the Illinois Consumer Fraud Act where the MLS misstated the lot size).

since sold the house to another, even though Defendant never performed any work on Plaintiffs' behalf, and even though the liquidated damages clause has long since been struck down as an unenforceable penalty by this Court.

In addition, Plaintiffs were denied the ability to buy another home instead (or this one) in the summer of 2016, depriving them of 6.9% home appreciation in the Chicago area[14] between then and now based on the nationally recognized Case-Shiller Index, which on a $1.175M house would equal $81,000.[15] Plaintiffs also spent at least $2,000 as a result of trips to and from Florida during the performance of the contract and for purposes of carrying out the contract, as well as an additional $22,400 in rent between October 2016 and December 2017 in the Chicago area. Ex. 11, Ewing Decl. at ¶¶ 62-63. The 6.1 Contract (and the ICFA) provides for attorneys' fees to the prevailing party, and this language was not altered in the Modification. Ex. 2, 6.1 Contract at ¶ 28; 815 ILCS 505/10a.

Plaintiffs are also entitled to punitive damages for their claims of fraud and under the Illinois Consumer Fraud Act. *Martin v. Heinhold Commodities, Inc.*, 643 N.E.2d 734, 757, 163 Ill.2d 33 (Ill. 1994). Punitive damages are appropriate for both when the tort and statutory violation "are committed with fraud; actual malice … or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others." *Id.* In this case, punitive damages are appropriate because Defendant's agent Mr. Carrier defrauded Plaintiffs into entering into the contract, and then tried to walk away with both the house and $120,000 during a time when it knew all along that it could perform

---

[14] *See* Ex. 14, November 27, 2018 Case Shiller Report, at p. 6 (showing 3% home appreciation in the Chicago area during the past year); and Ex. 15, November 27, 2017 Case Shiller Report, at p. 6 (showing 3.9% home appreciation in the Chicago during the past year).

[15] Plaintiffs can obtain their "expectation damages," which are the reasonably foreseeable "benefit of the bargain" damages that Plaintiffs would have earned had the contract been complete (i.e., home appreciation). Plaintiffs also can obtain "reliance" damages based on amounts they expended performing the contract, as well as compensatory damages for additional amounts they had to expend to cover Defendant's non-performance (i.e., rent). *See Merry Gentleman, LLC v. George and Leona Prods., Inc.*, 76 F. Supp. 3d 756, 761 (N.D. Ill. 2014).

no work based on fabricated time pressures and claims of breach that it knew full well had no effect on Defendant's inability to perform.

As early as June 3, 2016, Mr. Carrier began complaining about the "fruit cups" (Plaintiffs are two married men) and figuring out whether it could "get out of this contract." Ex. 16, June 3, 2016 email from Mr. Carrier, at p. 3. Apparently recognizing that it could not take the contractually specified remedy of completing the property as it wanted because it had previously lied about the work performed without permits, it instead tried to salvage its losses from Plaintiffs by blaming them for costs and delays it was going to suffer anyway. Defendant brazenly tried to pressure Plaintiffs and recoup damages from them even after the City of Chicago shut its project down, all while hiding its prior misrepresentations and shirking its contractual promise to notify Plaintiffs.

When it further became apparent to Defendant that its stop work order would force it to give Plaintiffs their money back under of the mortgage contingency, Defendant—instead of recognizing that it could never perform any work regardless and giving Plaintiffs their money back—remarkably decided instead to place the blame on Plaintiffs and try take all their money. Again, it did all this while hiding its prior fraud and contractual misrepresentations (presumably to decrease the odds of Plaintiffs' filing suit or to keep it secret in litigation) and rebuffing Plaintiffs' request for rescission.

Defendant's deception even continued in this litigation when it denied in discovery that the stop work order was placed on the property for pre-contract work and chose not to identify U.S. Waterproofing as having knowledge about the stop work order. Ex. 17, Def.'s Response to Request for Admissions at ¶ 4; Ex. 18, Def.'s Response to Pl.'s Interrogatories at ¶ 16. This deception was not revealed until Defendant was compelled by the court to produce its plainly relevant communications about the stop work order, which showed those responses to be patently false.[16]

---

[16] The wording of the responses, by speaking in the personal tense, makes it apparent that Mr. Carrier (Defendant's only meaningful member) personally completed and/or reviewed these responses

Plaintiffs suggest an amount of $30,000, which is approximately equivalent to the 24% profit the Plaintiffs could have earned in the Dow Jones Industrial from October 14, 2016 to the date of this filing if Defendant had returned their earnest money when it should have.

## IV. Plaintiffs are entitled to summary judgment on Defendant's counterclaim

### A. Plaintiffs did not cause any damages

Even if Plaintiffs did breach, and even if it were irrelevant that it was impossible for either party to obtain a mortgage commitment by the required dates because of the stop work order, Defendant has no damages. When the contract was terminated, the house was still in the same state it was in the day the contract was executed. Regardless of anything done by Plaintiffs, Defendant was unable to perform any work in the meantime. As a result, whatever carrying costs or delay damages Defendant may have suffered, it would have suffered those damages regardless of Plaintiffs' alleged breach. *See In re: Emerald Casino, Inc.*, 867 F.3d 743, 755 (7th Cir. 2017) (a breach is a "cause in fact of damages" only if "the damages would not have occurred had the [other party] not breached the contract.").[17] U.S. Waterproofing testified that the delays existed and were going to occur regardless of anything done by Plaintiffs, and there is no contradictory evidence.

In addition, Defendant cannot claim damages based on the difference between the contract price with Plaintiffs and the amount it later sold the house for, because such damages are available only when the contract price is higher than the home's market price. *See Kemp v. Gannett*, 50 Ill.App.3d 429, 365 N.E.2d 1112 (Ill. App. Ct. 1977) (resale damages must be based on "market price on the date of the breach"). In this case, however, Defendant's claim of breach requires it to demonstrate that Plaintiffs could have otherwise obtained a mortgage so that the deal could have been completed and it could realize those additional profits. But, one of the requirements for obtaining a mortgage

---

himself, thus personally contributing to a fraud on the court. Ex. 17, Def.'s Responses to Request to Admit at ¶ 18 ("I made no representation about independent enclosure") and 21 ("I cannot find an email...").

[17] There is no evidence that Plaintiffs were a "material element and a substantial factor" in the city placing a stop work order on the property, or the length of time it was in effect. *See id.*

commitment is an appraisal of the property demonstrating that its market price was equal to the contract price. Ex. 19, Hoppe Decl. ¶¶ 4-5. Defendant cannot have it both ways by claiming that Plaintiffs could have obtained a mortgage commitment requiring an appraisal of the property demonstrating that its market price is equal to the contract price, while at the same time legally needing to establish that the house's market price was lower than the contract price to get resale damages.

In addition, there is no genuine dispute of material fact that had Mr. Ewing proceeded with any mortgage commitment alone, the house would not have been able to appraise for the contract amount. The only evidence as to what the house would have appraised for in October 2016 had it been complete was a retroactive appraisal performed by Plaintiffs' expert, which concluded that the house would have appraised for $1,070,000, or $105,000 less than it would have needed to appraise for. Ex. 21, Appraisal of 1645 West Farragut.[18] This is unsurprising considering that Mr. Carrier sold the house immediately next door in August 2016 for $1,070,000, and 1645 West Farragut was intended to have equivalent finishes even under Defendant's interpretation of the contract. Ex. 21, April 22, 2016 email from Mr. Carrier to Plaintiffs ("The allowances are rounded up from material costs next door").[19] There is no evidence whatsoever that 1651 West Farragut could have ever appraised for the necessary amount of $1,175,000. Pl.'s SUF ¶ 62.

### B. Plaintiffs have the option of rescinding the contract because of fraudulent inducement or mistake

In the event Plaintiffs did breach and their performance was not excused, Plaintiffs have the option of declaring the contract void because Defendant fraudulently induced them into entering into

---

[18] Plaintiffs' expert performed a retroactive appraisal to opine on what 1645 West Farragut would have appraised for had it been completed with an equivalent level of finishes as 1651 West Farragut and appraised on October 3, 2016.

[19] Plaintiffs also allege that Mr. Carrier's actions in dropping the price of the house next door by $80,000, beginning within a week of Plaintiffs entering into the contract on 1645 Farragut, was a breach of the implied covenant of good faith and fair dealing, but they do not move for summary judgment on this basis.

the contract when Erik Carrier told Plaintiff's real estate agent that the work already performed had building permits, and that it would enclose the balcony. *See e.g., Tower Investors v. 111 East Chestnut*, 864 N.E.2d 927, 939-40 (Ill. App. Ct. 2007) ("Fraud in the inducement of a contract is a defect which renders the contract voidable at the election of the innocent obligor."). Plaintiffs have testified that they would not have entered into the contract without these oral promises. In fact, while negotiating the contract, Plaintiffs discovered a contractor performed work on their property in Florida without permits that cost them thousands of dollars and months to fix.

Even accepting Defendant's arguments, both parties were also mutually mistaken about the preexisting work's building code compliance, the ability to perform the contract without a stop work order, needing to double the amount of time estimated to complete the contract, and whether Defendant was enclosing the balcony. If Plaintiffs were unilaterally mistaken as to these issues, they were mistaken because of Defendant's representations. Both are a basis to rescind the contract.[20]

Plaintiffs therefore have the option of declaring the contract void and would elect to do so if the Court is inclined to grant Defendant summary judgment and deny Plaintiffs' summary judgment.

## <u>Conclusion</u>

Defendant lied the first day this contract was executed (and even before that), and there was not a single harm that Defendant suffered as a result of Plaintiffs. In contrast, Plaintiffs ended up with no house and no money and three years of litigation, all despite Defendant being unable to perform any work from the moment they met until it tried to walk away with Plaintiffs' earnest money. Plaintiffs' request the Court for an order to give Plaintiffs' their money back, compensatory damages, attorneys fees, and punitive damages.

---

[20] *See Rakowski v. Lucente*, 104 Ill.2d 317, 324 472 N.E.2d (1984) (requirements to establish mutual mistake include both parties being mistaken as to something that is material to the transaction); *Siegel*, 607 N.E.2d at 199 (setting forth requirements for unilateral mistake).

Dated: December 21, 2018

/s Randall P. Ewing, Jr.
Randall P. Ewing, Jr.
408 N.E. 8th Avenue
Fort Lauderdale, FL 33301
IL Bar Number: 6294238
Pro Se

/s Steven H. Mora
Steven H. Mora
2801 Lakeside Drive
Suite 207
Bannockburn, Illinois 60015
IL Bar No: 1953842
Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on December 21, 2018, I provided service to counsel of record by filing the foregoing document on the Court's ECF system.

/s Randall P. Ewing, Jr.
Randall P. Ewing, Jr.
408 N.E. 8th Avenue
Fort Lauderdale, FL 33301
IL Bar Number: 6294238
Pro Se