**U.S. DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

RANDALL EWING &
YASMANY GOMEZ

*Plaintiffs & Counter-Defendants*

v.

1645 WEST FARRAGUT LLC

*Defendant.*

Case No. 16-cv-9930

Judge Sharon Johnson Coleman

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW**

Plaintiffs Randall Ewing and Yasmany Gomez hereby submit this opposition to Defendant 1645 W. Farragut LLC's Motion for Judgment as a Matter of Law. Defendant's motion provides no factual support and is almost entirely devoid of legal support, instead simply providing pages of *ipse dixit*, and the factual assertions it makes are contrary to the record. Defendant's motion should be denied for the same reasons its first motion for judgment as a matter of law was denied, and for the same reasons this Court has previously rejected these arguments.

## I. There Was Sufficient Evidence For a Reasonable Jury to Conclude Plaintiffs Suffered Fraud Damages

Defendant first claims that Plaintiffs did not suffer damages because they "terminated the contract due to the inability to obtain a mortgage." But Hoppe testified that Plaintiffs could have purchased the property if only Ewing was on the mortgage and both Ewing and Gomez were on the title. Tr. at 334:22–335:4. Ewing and Gomez both testified that, even though the contract did not require them to accept this arrangement, Plaintiffs would have proceeded with this option and purchased the home had Defendant not breached the contract and committed multiple frauds, including refusing to enclose the second-floor balcony, charging Plaintiffs for delay costs occasioned by the unpermitted work and stop work order, and providing wildly inflated change-order pricing in violation of the contract's terms. That Plaintiffs ultimately exercised their contractual rights does not disprove the evidence that—had Defendant not lied to them repeatedly—they would have purchased the home. As a result, the damages they suffered from both being unable to buy the home they contracted for and Defendant's retention of their earnest money were caused by Defendant's fraud. There is no legal basis to overturn the jury's verdict on causation of damages.

Defendant next claims that Plaintiffs agreed on June 20, 2016 not to enclose the second-floor balcony, but this argument is contrary to the record. This Court already ruled in its summary judgment order and Rule 56(g) order that Plaintiffs requested the second-floor balcony to be enclosed and that Defendant refused. In addition, the June 20, 2016 email Defendant cites does not deal with the second-

floor balcony at all. As the email and other evidence demonstrates, Plaintiffs sent floor plans to Defendant in early June that included both enclosing the second-floor balcony, and also enclosing the first-floor porch and creating a side entrance. Carrier testified that he then sent back floor plans that included enclosing the second-floor balcony but not the first-floor porch and side entrance. Tr. at 562:2-20. Hence, Ewing wrote that Defendant "sent back floor plans that were completely different and did not include enclosing the front porch and side entrance." Ex. 33. Carrier testified that he then sent plans that also included enclosing the first-floor porch and side entrance. Tr. at 562:2-20. So when Ewing wrote on June 23 that "Nevertheless, we were happy to finally receive[] revised floor plans from Erik on Tuesday that matched exactly the approved floor plans that we sent several weeks earlier," it was because the revised floor plans had the enclosed first-floor porch—along with the enclosed balcony that had been included in the early June floor plans.

Moreover, Defendant's current contention is at odds with its own prior statements. Tellingly, in response to a request for admission, Defendant admitted that it was on June 23rd when it told Plaintiffs it would not be paying for the costs of enclosing the second-floor balcony. Ex. 48 at ¶ 20. This admission is plainly at odds with Defendant's current contention that the parties had agreed on June 21st not to enclose the balcony. When asked about these emails, Mr. Carrier even testified that he believed there had been no final decision on the second-floor balcony at this point, Tr. at 563:4-13, testimony in direct conflict with Defendant's current argument that Plaintiffs agreed on this day not to enclose the second-floor balcony. Moreover, even if it were true, Defendant's contentions regarding later conduct cannot overcome the evidence establishing that Defendant fraudulently induced Plaintiffs to enter the contract by promising to enclose the balcony prior to signing.

Defendant next argues that there could be no fraud with respect to the closing date because the contract provided: "if substantial completion is delayed due to fire, labor disputes, shortages or unavailability of labor, materials or transportation, Acts of God, acts of governmental authorities,

weather conditions or any other cause beyond Seller's reasonable control, as determined at Seller's sole discretion, said date shall be extended by the length of such delay." When Defendant made this argument to the jury, Plaintiffs responded that proper permitting and compliance with building codes were within Defendant's reasonable control because the individual executing the contract was also the general contractor in charge of permitting and construction. Carrier testified that he was the one responsible for ensuring that permits were obtained before work was performed and ensuring compliance with building codes, Tr. at 655:15-656:21, and U.S. Waterproofing was Defendant's agent. The jury plainly agreed that issues related to permits and building codes were not beyond Defendant's "reasonable control" at least when, as here, the Defendant and the general contractor are controlled by the same individual. Moreover, if Defendant were correct, this would only increase the need for Plaintiffs to rely on the representations made about permits and building code violations when executing the contract.

Finally, Defendant claims that its fraudulent failure to disclose the unpermitted work and stop work order could not have caused damage because Defendant had the ability to cure the issue before closing. The pertinent provisions state in full:

> If prior to Closing Seller becomes aware of matters that require modification of the representations previously made herein, Seller shall promptly notify Purchaser. If the matters specified in such Notice are not resolved prior to Closing, Buyer may terminate this Contract by notice to Seller and this Contract shall be null and void.

Ex. 2 at 4; *see* Ex. 1 at 7. In arguing that it did not have to disclose the stop work order so long as it resolved the unpermitted work issues before closing, Defendant conflates two distinct duties: its duties of disclosure and performance. Even if Defendant ultimately had corrected the unpermitted work, that would not rectify its affirmative misrepresentation that no unpermitted work had been performed. Plaintiffs testified that they would not have entered the contract, and would not have surrendered their earnest money to this project, had they known that unpermitted work had been performed prior

to the contract's execution. Defendant admits that it never notified Plaintiffs, and it was this initial non-disclosure that allowed Defendant to secure and retain Plaintiffs' earnest money, thereby causing their injury and damages. Whether Defendant had the right to fix issues before closing has nothing to do with the misrepresentations it made to induce Plaintiffs into the deal or with the violation of its obligation to correct those misrepresentations. Furthermore, the Court decided prior to trial that Defendant violated the contract's "continuing disclosure obligation," Dkt. 116 at 3, through its "failure to disclose the stop work order," *id.* at 5.

## II. There Was Ample Evidence for the Jury to Conclude That Defendant Breached the Contract

Defendant's first argument in support of a judgment as a matter of law on Plaintiffs' breach of contract claim is one that it has made *ad nauseam*: that it believed the representations were true when they were made. But there is ample evidence to contradict this claim, and the jury properly rejected it. The last email correspondence between Defendant and U.S. Waterproofing prior to the April 17, 2016 contract was on April 13th, when U.S. Waterproofing told Defendant: "We have revisions that should be submitted tomorrow. Still waiting on zoning approval though, I will update you as soon as I have it." Ex. 21 at 2. While Defendant claims it thought the issue to have been resolved at this point, the email plainly states that the permit had not yet been approved and that further submissions to the city were still required. Defendant—who "grew up around construction," who has gutted and rehabbed "a couple dozen" properties, who deals with permits and inspections as an "integral part" of his job, and has had a "lifetime of experience" in this field (Tr. at 492:19-494:7)—surely knew the difference between a permit application and permit approval, and all the things that can go wrong in between the two. Defendant did not represent that work was performed without permits and that there were building code violations, but that a permit application was pending; instead, Defendant in fact represented that there were no building code violations or work performed without approved permits. At the time it made those representations, there were building code violations and work performed

without approved permits. Whatever Defendant hoped as to future events, its contractual representations were false when they were made.

 Defendant next attempts to rely on an April 25, 2016 email in which U.S. Waterproofing wrote: "We are looking all good for the permit finally, however they requested a copy of your approved plans." Ex. 11 at 1. Defendant claims this email convinced him that the issue had been resolved before the May 2, 2016 Modification. But, again, Defendant represented in the May 2, 2016 Modification that it was not aware of any building code violations or work performed without permits. This was indisputably false. Defendant, as a licensed general contractor and experienced real estate agent, developer, and property manager, surely knows the difference between an approved permit and an application—even one that is "looking all good." Perhaps the biggest indication that this argument is false is that on May 5, 2016—only three days after signing the Modification—Defendant, unprompted, asked U.S. Waterproofing if there was "Any news on this?" *Id.* at 2. If Defendant thought the issue to be solved as of the April 25, 2016 email, why would it be asking on its own for updates on May 5, 2016? The jury correctly rejected Defendant's argument.

Defendant next repeats the argument it made earlier in the motion that it was under no obligation to disclose the stop work order so long as the issues were resolved prior to closing, but this argument fails for the same reasons: Defendant never disclosed the stop work order as it was required to do under its continuing disclosure obligation. Regardless, as discussed above, there is ample evidence that these representations were breached the moment the contract was executed, so any additional breach flowing from not modifying the representations in a timely manner is superfluous.

Defendant's next argument is that it did not breach the contract by refusing to release the earnest money held in escrow, relying on contract terms and the Court's prior orders denying Plaintiffs' motions to release the earnest money. Defendant's argument fails because the Court had already determined (repeatedly) that the liquidated damages clause that Defendant relied on in

retaining the money was an unenforceable penalty. *E.g.*, Dkt. 217 at 7. But even if it had not, the jury itself determined that Plaintiffs performed the contract. That determination was amply supported by the evidence. Because Plaintiffs performed the contract, Defendant had no legal basis to refuse the return of the earnest money. Defendant gambled that it could prove Plaintiffs breached the contract and that it could use the earnest money as leverage throughout this litigation, but it lost. Because Plaintiffs provided evidence of their own performance—and the jury agreed—there is no basis to conclude as a matter of law that Defendant did not breach the contract by refusing to return the earnest money.

Next, Defendant claims that Plaintiffs' non-performance prevented it from performing the contract. But this argument fails because the jury concluded that Plaintiffs did not breach the contract. And even if they had breached the contract months later with respect to floor plans or the mortgage contingency, Defendant was in material breach of the contract on day one because of its false contractual representations. The jury concluded that Plaintiffs made reasonable efforts to obtain a mortgage commitment based on evidence showing that Plaintiffs worked with multiple banks and were informed there was nothing more to do until the house was close to being finished, which never occurred for reasons unrelated to them. The jury also concluded that the contract did not require Plaintiffs to accept a mortgage commitment in Ewing's name alone based on a reasonable construction of the contract defining "Purchaser" as Ewing and Gomez. Finally, the jury reasonably concluded it was impossible for Plaintiffs to obtain a mortgage commitment because no one could obtain the mortgage required by the contract since the home remained gutted on the date of closing. Defendants' citation to *Smith v. Vernon*, 6 Ill. App. 3d 434 (1972), is inapposite because the buyers there failed to make a reasonable effort to obtain a mortgage by rejecting a mortgage commitment offer they had obtained and by not cooperating with defendant's mortgage lender knowing that obtaining a commitment was feasible. *Id.* at 436. Here, as the jury found, Plaintiffs cooperated with Hoppe to

obtain the mortgage commitment called for in the contract and did not receive, and could have never received, a firm mortgage commitment from him or anyone else because the house remained gutted as of closing for reasons having nothing to do with Plaintiffs.

Defendant next claims that the contract did not require it to enclose the second-floor balcony. Defendant relies on Addendum 2, which set out certain changes related to a dog area in the basement and a movie room. But as Ewing testified at trial, those were included on Addendum 2 because the next-door property did not have a dog area in the basement or a movie room. However, the next-door property did have an enclosed second-floor balcony, and thus enclosing the balcony was covered by the provision stating that "In all cases where the amenities and/or the level of finishes are not set forth herein, the parties shall look to [the next-door property] as a model for such amenities and finishes." Ex. 2 at 7. There was ample evidence that an enclosed balcony is an amenity, including from Ewing, Gomez, and their realtor. Even Defendant testified that an enclosed balcony could be an amenity. Tr. at 581:2-4. Extrinsic evidence also showed that the property was marketed with an enclosed balcony and that the parties had conversations prior to executing the contract in which it was agreed the balcony would be enclosed.

Defendant next argues that Plaintiffs did not suffer damages as a result of its breach because they terminated the contract pursuant to the mortgage contingency. But as explained previously, the only evidence introduced at trial on this point was that Plaintiffs would have purchased the home with Ewing on the mortgage and both Ewing and Gomez on the title had Defendant not already breached the contract and defrauded them in numerous ways.[1]

---

[1] Defendant's claim that Plaintiffs "could not afford to purchase the property" is frivolous. There is no evidence that Plaintiffs could not afford to purchase the property. Hoppe testified that both Ewing and Gomez could appear on the title, and a stipulation read to the jury stated that Ewing had the financial ability to qualify for a mortgage. As Hoppe testified, the issue was Gomez's credit score, not Plaintiffs' financial ability. It is ironic that Defendant makes this argument now when its counterclaim and damages were premised on Plaintiffs' ability to purchase the property.

Defendant's final argument claims that Plaintiffs "requested damages for los[t] home appreciation *and* interest on the money held in escrow" and this amounts to a "double recovery." But Plaintiffs never put the issue of prejudgment interest before the jury, and it has not moved the Court for an award of prejudgment interest. Defendant also claims that Plaintiffs did not put forward sufficient evidence for the $2,000 in damages related to travel in connection with performing the contract. But Ewing testified that those damages were incurred, and Defendant proffers no authority suggesting that this testimony is insufficient or that more detail was required. Defendant had every opportunity to cross-examine Ewing on these expenses or to argue to the jury that Ewing's testimony as to these expenses was not credible without documentary support. Defendant also claims there was no evidence as to rental costs in Chicago, but Ewing testified to his actual rental costs, and Defendant testified as to the fair market rental value of the subject property. Defendant's argument has no basis in fact.

## CONCLUSION

For the foregoing reasons, Plaintiffs ask this Court to deny Defendant's renewed motion for judgment as a matter of law.

Dated: January 20, 2022

 /s/ Carol O'Keefe
Carol O'Keefe
KOREIN TILLERY LLC
505 North Seventh Street
Suite 3600
(314) 241-4844
Saint Louis, Missouri 63101
cokeefe@koreintillery.com

Ryan Z. Cortazar
KOREIN TILLERY LLC
205 N. Michigan Avenue
Suite 1950
Chicago, Illinois 60601
(312) 641-9750
rcortazar@koreintillery.com

Steven H. Mora
250 Parkway Drive
Suite 160
Lincolnshire, Illinois 60069
(847) 230-9495
smora@stevenmoralaw.com

*Counsel for Plaintiffs*